Filed 4/19/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ANTHONY SAM, individually and as Managing Manager of Chino Americana Concepts 2013303 LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RENEE KWAN et al.,<br><br>    Defendants and Respondents. | B314426 and B315773<br><br>Los Angeles County<br>Super. Ct. No. BC721121 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hon. Michael P. Linfield, Judge. Affirmed in part, reversed in part, and remanded.

Berding & Weil, Anne L. Rauch and Trinette S. Sachrison for Plaintiff and Appellant.

Office of the Los Angeles City Attorney and Miguel Bahamon; Best Best & Krieger, Christopher E. Deal and Bao Pham for Defendant and Respondent Board of Fire and Police Pension Commissioners for the City of Los Angeles.

Anderson, McPharlin & Conners, Vanessa H. Widener and Motunrayo D. Akinmurele for Defendant and Respondent First American Title Insurance Company.

Saiki Law Group and Eric H. Saiki for Defendants and Respondents Renee K. Kwan, Vibrant Developments LLC, Asset Management 328 LLC, CAC 600 LLC, Chino Americana Holdings, LLC, and Fidelity Surety & Investments Inc.

_____

Anthony Sam and Renee Kwan formed a limited liability company and bought a parking lot.  Unbeknownst to Sam, Kwan used their company the next year to sell the lot for millions in profit.  Sam eventually found out and accused her of fabricating documents, pocketing the money, and giving Sam nothing.  Sam sued Kwan and her entities, as well as the company providing title and escrow services for the sale.  Sam also sued the parking lot buyer.

The trial court experience was unhappy for Sam.  Pretrial rulings put him out of court without a remedy.  We affirm some of these rulings, but reverse others, including a summary judgment ruling that the parking lot buyer was a bona fide purchaser for value.  We remand.

## I

When reviewing pleading challenges, we take the pleaded facts as true.  Review of summary judgment rulings requires inferences in favor of the party losing its right to a jury trial.  These familiar rules pack a hefty punch here.

## A

Kwan and Sam had worked together on various deals since about 2011.  In 2014, they got interested in a parking lot in

2

downtown Los Angeles. They decided to buy it and redevelop it into a restaurant.

To proceed with the venture, Sam and Kwan formed a limited liability company.

On October 13, 2013, they signed an operating agreement for their new company: Chino Americana Concepts 2013303 LLC.

We refer to Chino Americana Concepts 2013303 LLC simply as 2013 LLC.

2013 LLC had four members. Each member was, individually, also a limited liability company. Some had lengthy but similar names. This makes for a potentially confusing cast, but the cast is vital here: we emphasize it is important to keep these four straight. So we list these four members, give them shorthand names, and note their percentage interest in 2013 LLC:

1. Vibrant Developments LLC ("Vibrant") owned 49% of 2013 LLC,
2. Chino Americana Concepts CGW LLC ("CGW") had a 14.78% interest,
3. CAC 600 LLC ("600 LLC") had a 18.48% interest, and
4. Chino Americana Concepts W LLC ("W LLC") held a 17.74% interest.

In sum, the four members of 2013 LLC were Vibrant, CGW, 600 LLC, and W LLC.

Vibrant owned 49%. The combined share of CGW, 600 LLC, and W LLC was 51%, which will prove significant.

Vibrant was Kwan's entity. She controlled it, although Sam allegedly held a minority position. Kwan, however, owned no part of the other three members.

3

Sam alleged he owned a controlling interest in these other three.

As between Sam and Kwan, then, Sam had—or thought he had—more ultimate control over 2013 LLC than Kwan did.

2013 LLC's operating agreement designated Sam as the managing manager, appointed Kwan and Sam as directors, and specified Vibrant would handle 2013 LLC's day-to-day operations. The signature blocks for CGW, 600 LLC, and W LLC listed Sam as the signatory as the managing manager of each entity. Kwan signed on behalf of her entity Vibrant.

2013 LLC bought the parking lot in August 2014 for $1.6 million. Half the purchase money came from a bank loan Sam obtained and guaranteed. The other half came from foreign investors Kwan procured. Kwan herself put no money into the deal.

To effectuate the parking lot transaction, Sam signed the deed of trust and the assignment of rents, which were recorded documents in the lot's chain of title.

Sam's signatures on these two recorded documents will assume significance in our analysis. Sam signed both documents as "Anthony Sam, Manager of Chino Americana Concepts 2013303 LLC."

In other words, recorded documents in the parking lot's chain of title announced that, in 2014, the manager of 2013 LLC was Sam. Kwan's name does not appear in these documents.

During the purchase of the parking lot, Kwan submitted a 2013 LLC operating agreement, *dated October 13, 2013*, listing *Sam* as the managing manager.

4

As we shall see, another version of this document, bearing the same date but Kwan's name and not Sam's, will appear in this litigation.

## B

2013 LLC successfully bought the parking lot.

Relations between Sam and Kwan, however, then soured. Sam alleged that, in June 2015, he and Kwan butted heads on a different deal. Sam claimed that, as a result, Kwan asked him to "sign over his interest" in 2013 LLC, but that he refused her request. He suggests the breakdown motivated her to do him wrong.

According to Sam, Kwan then "fabricated" and "forged" documents to shut Sam out of 2013 LLC and to sell the lot without Sam's knowledge. Sam swore he never relinquished his rights in any company to Kwan, and he told Kwan he would not transfer his rights.

A contrary and anodyne version of past events was that the members of 2013 LLC properly and legitimately replaced Sam with Kwan as the LLC's manager.

These opposing accounts presented a dispute of fact, unresolved to this day. In the face of this conflicting evidence, however, the trial court would embrace the latter anodyne version as the undisputed truth.

## C

The 2015 parking lot buyer was the Board of Fire and Police Pension Commissioners for the City of Los Angeles ("Board").

The Board contacted Kwan and began negotiating with her to buy the lot.

5

In December 2015, Kwan agreed, without informing Sam, to sell the parking lot to the Board. The Board paid $3.8 million for the lot in 2015.

In other words, the property turnaround reaped more than two million in profit in less than a year and a half.

To help buy the lot from Kwan, the Board retained a law firm as outside counsel. The firm drafted a Purchase and Sale Agreement and Joint Escrow Instructions for the Board.

The Board and Kwan engaged First American Title Insurance Company ("First American") to perform the dual roles of title insurer and escrow agent.

First American prepared a preliminary report, dated November 23, 2015, which it sent to the Board's attorney.

This report referred to and, in its electronic form, hyperlinked the recorded deed of trust and the recorded assignment of rents that Sam had signed in 2014 as the manager of 2013 LLC.

As noted, these recorded documents were in the lot's chain of title. And as noted, only Sam had signed these documents. Kwan's name was not in them.

The Board's attorney devoted only limited attention to First American's report. She clicked on hyperlinks to get the recorded deed of trust and the recorded assignment of rents.

The attorney testified she "looked at," but did *not* "review," the deed of trust and the assignment of rents.

Interpreted in a light favorable to Sam, this measured phrasing means the attorney did not carefully study the two documents in the chain of title identifying Sam as the 2014 manager of 2013 LLC.

Corroborating this interpretation is the attorney's testimony she did not know, and did not ask, "who Anthony Sam was." The attorney also testified she did *not* review a particular portion of the preliminary report called the "informational notes." This unreviewed portion of the report set forth what documents were important to examine when a land deal involved a limited liability company. This portion highlighted the need to examine the operating agreement of a limited liability company and to obtain proof the limited liability company was properly operating through its manager.

The attorney testified she did not review this portion and explained, "The informational notes have to do with what my client has to provide, not with what the seller has to provide. And I didn't represent the seller in this transaction."

The Board's attorney thus suggested she lacked interest in "what the seller has to provide."

This incurious stance is important. We will discuss the limited scope of the attorney's review in our analysis of the motion for summary judgment, where we will conclude the Board's title research was deficient. For now, however, we continue with the facts.

## D

The 2015 sale of the parking lot proceeded.

The Board and 2013 LLC signed a Purchase and Sale Agreement and Joint Escrow Instructions. *Kwan* signed on behalf of 2013 LLC as its "owner representative and manager."

The transaction between Kwan and the Board was to close on December 31, 2015.

The closing day of December 31 was hectic.

7

At 9:24 a.m., the escrow officer announced the buyer had yet to receive seven essential closing documents from the seller. The officer stressed the importance of closing on time to avoid accruing additional interest. The documents the escrow officer needed that day included the operating agreement for 2013 LLC and a "[s]ignoff to their exchange agreement."

The escrow officer copied the Board's attorney on this 9:24 a.m. email.

At 12:30 p.m., Kwan emailed the escrow officer, attaching a *version* of the 2013 LLC operating agreement.

Kwan's version of this operating agreement was identical to the one used earlier for 2013 LLC to buy the parking lot, except Kwan's version deleted Sam as manager and put her name where Sam's name used to be in the slots for manager and director and in the signature blocks for the member entities.

Both versions of the operating agreements, however, bore the same date: "October 13, 2013."

It would take some explaining to rationalize two agreements with the same date naming different managers. Sam and Kwan developed conflicting explanations.

Kwan said it was a simple and innocent "mistake."

Sam, however, charged Kwan forged her version by altering the names, but then she carelessly neglected to change the date. Kwan's goal, Sam alleged, was to make it appear, falsely, that Kwan had authority to sell the parking lot.

We return to the minute-by-minute developments on the day of closing.

At 2:04 p.m., title officer Anthony Rivera emailed Kwan that "we have determined a written consent will be required from the members . . . ." Rivera explained section 4.03(b) of the 2013

8

LLC operating agreement prompted his request.  Section 4.03(b) allowed 2013 LLC's manager to sell company assets, but only upon an "affirmative vote of a Majority of [LLC] Members . . . ."

At 2:21 p.m., Kwan responded by email, attaching a one-page document.

Kwan's 2:21 p.m. document is central to this case.  The document's title was "CORPORATE RESOLUTION."  It was dated December 31, 2015.  It purported to speak for the four members of 2013 LLC.  It recited, with our italics, that Kwan did "hereby certify that at a *meeting* of the Board of Members" of 2013 LLC the members resolved (1) to sell the parking lot to the Board for $3.8 million and (2) to authorize Kwan as 2013 LLC's manager to take all necessary actions relating to this sale.

On its face, this 2:21 p.m. document posed many questions.

> 1.  Had 2013 LLC truly held a members' "meeting" in the 17 minutes between 2:04 and 2:21 p.m. on December 31, 2015?  Had different people been notified, and had they communicated and voted, and had the document been prepared in this short time?  Or was Kwan saying the "meeting" had been her with herself?
>
> 2.  Kwan signed for *CGW* as "Managing Manager, Chino Americana Holdings."  She signed for *600 LLC* and for *W LLC* as "Manager, Chino Americana Holdings."  But what was this new *Chino Americana Holdings* entity, and why did its manager, or managing manager, have authority to sign on behalf of three entities comprising 2013 LLC?

9

3. Could a document signed only by Kwan constitute *independent* evidence Kwan had authority to transact on behalf of 2013 LLC?

Sam alleged Kwan "forged" this "fabricated" document. He claimed Kwan fraudulently created it to make it look like she had authority she did not possess.

According to Sam, discrepancies in the closing documents were blatant enough to put the Board on inquiry notice that Kwan lacked authority to sell the lot.

At 2:33 p.m. on December 31, 2015, the deal closed. Kwan signed the grant deed as manager of 2013 LLC.

Kwan instructed First American to transfer $190,000 of the purchase price to Fidelity Surety & Investments Inc. (Fidelity) as a "finder's fee." Kwan owned Fidelity.

First American wired the remainder of the funds to an "exchange company" that was going to assist in procuring another piece of property.

Kwan testified the monies from the parking lot sale ultimately went to fund unrelated litigation, *against Sam*.

### D

Sam filed this lawsuit.

At the time of the parking lot negotiations and sale, Sam knew nothing about the transfer of the lot. Kwan had not shared this information with him. Some time later, however, Sam asked Kwan for an accounting of the parking lot rents, but she did not respond. Sam investigated and discovered the sale.

Sam sued Kwan. He filed suit as an individual and as the managing member of 2013 LLC. He sued Kwan personally and also First American, the title and escrow company on the deal. His first amended complaint added Vibrant, Asset

10

Management 328, LLC ("Asset"), 600 LLC, Chino Americana Holdings, LLC ("Holdings"), the Board, and the escrow officer as defendants, later amending to substitute Hertzberg Holdings, LLC ("Hertzberg") and Fidelity in for Does 1 and 2. Asset and Hertzberg are members of Vibrant.

Sam alleged claims for breach of fiduciary duty, breach of contract, quiet title, breach of the covenant of good faith and fair dealing, violations of Business and Professions Code section 17200 et seq. (Unfair Competition Law), escrow negligence, fraud, civil conspiracy, and declaratory relief. Various parties cross-complained against each other.

The trial court denied First American's motion for summary judgment.

The court granted the Board's motion for summary judgment.

The remaining defendants launched pleading challenges. Fidelity demurred to the first amended complaint. The trial court sustained the demurrer in part with leave to amend and in part without leave to amend. Sam filed a second amended complaint alleging the same causes of action against the same defendants. Fidelity filed a demurrer to the second amended complaint. First American, Kwan, Vibrant, Asset, 600 LLC, and Holdings all filed motions for judgment on the pleadings.

Sam lodged a proposed third amended complaint in connection with his oppositions to the motions for judgment on the pleadings. The trial court overruled as moot part of Fidelity's demurrer and, as to the remaining causes of action, sustained it without leave to amend. The trial court granted the motions for judgment on the pleadings of First American, Kwan, Vibrant, Asset, 600 LLC, and Holdings without leave to amend.

In short, Sam's lawsuit met total defeat.  He appealed.

## II

We summarize our rulings.

- We reverse the denial of Sam's leave to amend his claims on behalf of 2013 LLC.  We remand to permit Sam to bring these claims on behalf of the member entities, as reflected in his proposed third amended complaint.

- We reverse the remainder of the grants of judgment on the pleadings, except as to the breach of contract claims based on the operating agreements of 600 LLC and Holdings against 600 LLC and Holdings.

- We affirm the ruling that the breach of contract claims based on the operating agreements of 600 LLC and Holdings against 600 LLC and Holdings cannot be amended to state viable claims.

- We reverse the sustaining of Fidelity's demurrer as to the civil conspiracy cause of action.

- We reverse the grant of the Board's summary judgment motion.

## A

We begin with the motions for judgment on the pleadings.

### 1

Our first issue is whether Sam had standing to claim on behalf of 2013 LLC.  Based on Sam's supposed lack of standing, the court granted the motions for judgment on the pleadings as to his claims on behalf of 2013 LLC.  Sam originally sued as the "managing *member*" of the LLC.  Various defendants argued, and the trial court agreed, that only a *member* could bring a claim on behalf of 2013 LLC.

12

The trial court ruled Sam, as a *non*-member manager, could not bring claims on behalf of 2013 LLC. This is especially true as the 2013 LLC operating agreement specifically required approval by a majority of the members to commence "any" litigation.

On this point, the trial court was right.

Sam, however, was not *merely* a non-member *manager*. He alleged he owned a controlling interest in CGW, 600 LLC, and W LLC, which were three of the four LLC members of 2013 LLC. Indeed, Sam submitted a proposed third amended complaint bringing the claims on behalf of 2013 LLC in the name of these three member entities. He attached operating agreements demonstrating his control of the controlling member of these three entities.

The proposed third amended complaint and attached documents established Sam could amend to allege these claims through appropriate entities with standing. It was an abuse of discretion to deny leave to amend when Sam had so clearly laid out a viable fix for his pleading.

Kwan argues Sam waived his right to file derivative claims because, by filing his second amended complaint, he conceded his first amended complaint was deficient. Sam included the claims involved here in his second amended complaint, and so Kwan's argument fails.

To summarize, we reverse the order denying Sam leave to amend his claims to bring them in the name of the member entities.

2

The court correctly ruled Sam lacked standing *as an individual* to bring claims for breach of fiduciary duty and escrow

13

negligence against First American. Because Sam was not a party to the escrow instructions upon which he based his claims, we affirm. (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 710 [escrow holder owes no duty to strangers to the escrow].)

First American argues 2013 LLC's claims against it also fail because its conduct caused *2013 LLC* no damages. 2013 LLC received the proceeds of the sale, and First American cannot be blamed if Kwan later improperly took the funds. This is true, but Sam did not limit the claims to the missing funds. He also alleged First American's conduct allowed Kwan to take unauthorized action and to bypass 2013 LLC's proper decisionmaking process as well. On behalf of 2013 LLC, these allegations sufficed to show damages.

3

As to Sam's breach of fiduciary duty claim, the court granted Kwan's motion for judgment on the pleadings. Citing *Galardi v. State Bar* (1987) 43 Cal.3d 683, 691, the court ruled Sam sufficiently alleged Kwan owed him a fiduciary duty as a joint venturer in 2013 LLC. The court reasoned, however, that Sam had not alleged *how* Kwan's breach had harmed him.

Sam adequately alleged harm: according to his complaint, Kwan deceitfully removed him as managing manager, prevented him from exercising his right as controlling member of three members of 2013 LLC, barred him from participating in the decision to sell the property, and cut him off from the sales profits.

We thus reverse this ruling.

14

The trial court granted judgment on the pleadings to Vibrant, Asset, 600 LLC, and Holdings on Sam's breach of contract claims. The court found Sam had not alleged the existence of contracts with these defendants.

We affirm the trial court's ruling as to the claims relating to the operating agreements of 600 LLC and Holdings. The operating agreement for *600 LLC* shows Sam was not a party. Holdings is a single-member limited liability company with Sam as the only member. Therefore, Sam is the only party to the Holdings operating agreement.

Sam *was*, however, a party to the operating agreement for Vibrant. The members of Vibrant were Asset, Hertzberg, and Sam. Vibrant and Asset incorrectly argue the provided operating agreement is invalid because it is unsigned. (*Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.* (2015) 240 Cal.App.4th 763, 773 [lack of signature does not necessarily vitiate contract].) Sam alleged the existence of a contract, and the agreement identified him as a party.

Vibrant and Asset also argue that, even if a contract did exist, Sam failed to allege a breach. This argument falters: Sam alleged Vibrant and Asset divested him of his membership shares in contravention of the requirements laid out in the operating agreement. This alleged breach.

In sum, we affirm the trial court's ruling granting judgment on the pleading as to the claims for breach of the 600 LLC and Holdings operating agreement against 600 LLC and Holdings, and reverse as to the claim for breach of the Vibrant operating agreement against Vibrant and Asset.

5

The court granted Kwan judgment on the pleadings on Sam's fraud claim. The court found Sam did not allege Kwan knowingly made a false representation to Sam with the intention of deceiving him, or that Sam justifiably relied on any false representation by Kwan. This ruling was erroneous.

Sam based his fraud claim on concealment. A claim for fraud based on concealment will lie where the defendant concealed a material fact; the defendant was under a duty to disclose the fact to the plaintiff; the defendant concealed the fact with the intent to defraud the plaintiff; the plaintiff was unaware of the fact and would have acted differently if plaintiff knew; and the concealment harmed the plaintiff. (*Kaldenbach v. Mutual of Omaha Life Insurance Co.* (2009) 178 Cal.App.4th 830, 850.)

The trial court found Kwan did owe Sam a fiduciary duty. Sam alleged that Kwan, as his fiduciary, was under a duty to disclose material facts that she concealed: namely, her fabrication of a false operating agreement, her sale of the property without proper approval, and her failure properly to account for the funds. By means of his detailed charges of "forgery" and "fabrication," Sam alleged Kwan's scienter with particularity.

Sam adequately alleged a claim for fraud based on concealment.

6

The trial court granted Kwan judgment on the pleadings as to the conspiracy claim because the court found the fraud claim formed the basis for the conspiracy claim. Thus, because the court had granted judgment on the pleadings on the fraud claim, the court found the conspiracy claim also would fail. We are

16

reversing the trial court's ruling on the fraud claim.  We concomitantly reverse its conspiracy claim ruling.

7

The trial court granted Kwan judgment on the pleadings as to the Unfair Competition Law claim because it found the fraud and conspiracy claims insufficient, and these constituted the Unfair Competition Law claim.  Thus, the court held, the Unfair Competition Law claim was also deficient.  We reverse the ruling as to the Unfair Competition Law claim because we have reversed the rulings about fraud and conspiracy.

B

We turn to the order sustaining Fidelity's demurrer.  The trial court sustained this demurrer as to Sam's claims for civil conspiracy.  The court found the underlying conspiracy claim was fraud, and the allegations were insufficient because Sam did not name Fidelity in his claim for fraud.

In his cause of action for civil conspiracy against Fidelity, Sam alleged Kwan and Fidelity conspired to transfer $190,000 from the escrow to Fidelity as a "finder's fee."  Sam alleged Fidelity performed no services to earn this fee, and the funds rightfully belonged to 2013 LLC.  Although Sam omitted these allegations from his cause of action for fraud, the basis of his claim against Fidelity was plain.  (*AREI II Cases* (2013) 216 Cal.App.4th 1004, 1022 [allegations of conspiracy suffice if they apprise defendant of character and types of facts plaintiff will rely on to establish conspiracy].)  Sam is entitled to amend to state claims on behalf of 2013 LLC through the member entities.  It was an abuse of discretion to deny Sam leave to amend his civil conspiracy claim.

17

## C

The court erroneously granted the Board's motion for summary judgment.

The ruling was that the Board was a bona fide purchaser for value, which gave the Board title to the parking lot free and clear of Sam's claims. The court held that "[u]ndisputed evidence" demonstrated the Board purchased without notice of Sam's alleged interest in the lot.

Factual disputes, however, precluded summary judgment.

## 1

The bona fide purchaser doctrine enables a buyer to keep the purchased property if it can show it bought for value and lacked knowledge or notice of another's claim. When the buyer has actual or constructive notice of a prior interest, however, the buyer takes the property subject to those other interests. (*In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 437 (*Cloney*).)

For a buyer to establish it was a bona fide purchaser for value, it must demonstrate it conducted research with due diligence to see if the title it was planning to buy would be good.

California's quiet title laws put this duty of inquiry on buyers of real estate. They must inquire into the validity of their prospective ownership claim. A contrary incentive would encourage deliberate blindness and would be "inimical to the entire system of real property law in California." (*Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704, 720 (*Tsasu*).)

Due diligence requires prospective buyers to heed warning signs. (*Tsasu, supra,* 62 Cal.App.5th at p. 720.)

The buyer is not entitled to interpret ambiguities in its own favor. Neither may it ignore reasonable warning signs in the recorded documents. (*Triple A Management Co. v. Frisone* (1999)

69 Cal.App.4th 520, 530–531.)  Nor is the buyer "entitled to ignore information that comes to it from *outside* the recorded chain of title, to the extent such information puts [it] on notice of information that reasonably brings into question the state of title reflected in the recorded chain of title."  (*Id.* at p. 531; see also *612 South LLC v. Laconic Ltd. Partnership* (2010) 184 Cal.App.4th 1270, 1280; *Cloney, supra,* 91 Cal.App.4th at pp. 441–442.)

2

Two factors in this case highlighted the importance of investigating whether Kwan actually had the sale authority she claimed.

First, the preliminary report notes required proof the manager had duly executed authority to act on behalf of the limited liability company.

Second, title officer Rivera testified to industry practice. Recall Rivera was a key participant in this closing.  Rivera had served as a title officer some 120,000 times in his 38 years of experience.  About 80 percent of the time, the sellers were limited liability companies.

Rivera testified that a preliminary report is *not* a representation of the condition of title, but is done to evaluate risk solely for the benefit of the title *insurer*.

In accord with the notes in the preliminary report—the very notes the Board's attorney did *not* review—Rivera testified that, when a limited liability company is involved, it was "standard procedure" to review that organization's documents: "You're supposed to get down to who actually can sign."

Rivera therefore demanded and reviewed the operating agreement for 2013 LLC.  Based on his review, he determined he

19

needed proof the members of the limited liability company actually were consenting to the sale.

This is why, at 2:04 p.m. on the day of closing, Rivera emailed Kwan for proof of the members' consent.

These two factors underlined the importance of ensuring Kwan actually had authority to sell on behalf of 2013 LLC.

3

At the summary judgment stage, the Board's inadequate diligence flunked the test. Reading the record in Sam's favor, the Board and its outside legal counsel did not question why 2013 LLC, when buying the lot, had one manager but, the next year when selling the lot, it had a different manager. The lawyer entirely skipped the portion of the preliminary report that stressed the need, in the case of a limited liability company, to examine the company's operating agreement and to obtain proof the company was properly operating through its manager. Her rationale was that "[t]he informational notes have to do with what my client has to provide, not with what the seller has to provide. And I didn't represent the seller in this transaction." This rationale was mistaken. The buyer should have demanded these documents *from* the seller, as Rivera in fact did for his employer. The attorney's conception of the buyer's duty of due diligence in this situation was flawed.

The Board's attorney also failed to review the deed of trust and the assignment of rents.

As the *Tsasu* decision aptly noted, real estate buyers must inquire into the validity of their prospective ownership claim. (*Tsasu, supra,* 62 Cal.App.5th at p. 720.)

The Board argues, with our emphasis, that "Sam points to no *statute* that holds that operating agreements are proper proof

of his ownership rights . . . ." No *statute* was needed here. As Rivera testified, reviewing operating agreements is standard, and crucial, in real estate transactions involving limited liability companies. The Board relies heavily on what it terms Kwan's "ostensible authority" to act on behalf of 2013 LLC. But the Board's observations of Kwan are no substitute for the written documentation Rivera testified was necessary to this crucial determination.

Title officer Rivera therefore asked Kwan to prove the members of 2013 LLC consented to her actions, but Kwan's 2:21 p.m. response was suspect on its face. Earlier we noted the many ways in which this document raised more questions than it answered. This suspect document asked readers to believe the members of the limited liability company were notified, gathered, voted, and typed up their corporate resolution in the 17 minutes between the 2:04 p.m. demand from Rivera and the 2:21 p.m. delivery by Kwan. Alternatively, the document might be interpreted as Kwan's claim that she controlled everything and the "meeting" happened when she "met" with herself.

A reasonably prudent buyer would have questions about either story. Gathering people together, communicating, voting, and recording the event in 17 minutes beggars belief. Alternatively, if Kwan was claiming she held a "meeting" with herself alone and that created sufficient authority to her to transact the sale, a reasonable buyer would wonder what, in this short time, had become of Sam, who the year before had been signing everything for the limited liability company. And is it even sensible to speak of meeting with yourself?

Moreover, Kwan purported to be signing for three of the member entities as the "Managing Manager," or, alternatively

21

but without explanation, as the "Manager," of a different entity, unmentioned in the 2013 LLC operating agreement.

The 2:21 p.m. document likewise bore the earmarks of self-justification: the document was supposed to be *independent* validation of Kwan's status, but it contained only Kwan's signatures.

The fact Kwan signed her own name four times did not strengthen the apparent force of her supposed proof. The repetition merely emphasized its circular nature.

This suspect claim of authority would have caused a reasonable and prudent buyer to inquire further. But instead of pausing to get to the bottom of the situation, the Board went ahead and closed the deal 12 minutes later, at 2:33 p.m.

Haste makes waste.

4

Perhaps all Kwan's documents were valid and she truly enjoyed full authority to sell the lot on behalf of 2013 LLC. But Sam's factual claim was sharply to the contrary: that Kwan had forged and fabricated these instruments and that he, not Kwan, retained authority to manage 2013 LLC. This factual dispute was the heart of the case.

Another factual dispute also doomed the summary judgment motion. With its motion, the Board submitted a 2013 LLC operating agreement as an exhibit to a declaration. As Sam gleefully pointed out in opposition, the Board's submitted version of the operating agreement listed *Sam* as the manager, not Kwan. Yet the Board was moving for summary judgment on the ground that Kwan and *not Sam* was the manager. By presenting an account factually at odds with itself, the Board's moving

papers spotlighted the central fact in controversy: who truly was authorized to manage 2013 LLC in 2015, anyway?

Further to this point, Sam's complaint appended the two contradictory versions of this operating agreement. These versions are identical in every respect, except the second substitutes Kwan's name for Sam's in every instance. One version names Sam as the manager. The other names Kwan. Perplexingly, both bear the same date: "October 13, 2013."

How can two operating agreements for the same company with the same date name different managers? When Kwan was asked to explain, Kwan testified this was an innocent "mistake." Sam alleged, however, that Kwan "fabricated" this "unauthorized version" of the agreement and falsified another document titled "WRITTEN CONSENT OF MEMBERS"—another Kwan invention that, Sam claimed, on its face was flawed and unbelievable. Sam said the only "mistake" was to believe Kwan at all.

A fact finder must decide who is telling the truth. We reverse the summary judgment ruling.

D

We deny Sam's request for judicial notice as moot.

<b>DISPOSITION</b>

We reverse the order denying Sam leave to amend his claims brought on behalf of 2013 LLC, and we remand with instructions to permit Sam to bring these claims on behalf of the member entities as reflected in his proposed third amended complaint. We reverse the remainder of the court's grant of judgment on the pleadings except as to the breach of contract claims based on the operating agreements of 600 LLC and Holdings against 600 LLC and Holdings. We reverse the trial

23

court's sustaining of Fidelity's demurrer as to the civil conspiracy cause of action. We reverse the trial court's grant of summary judgment in favor of the Board. We remand for further proceedings consistent with this opinion and award costs to Sam.

WILEY, J.

We concur:

GRIMES, Acting P. J.

VIRAMONTES, J.